# IN THE UNITED STATES DISTRICT COURT FOR THE

# WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| -vs- ) | No. **CR-24-067-JD** |
| ) | |
| PHILLIP NILES MARTIN, ) | |
| ) | |
| Defendant. ) | |

## GOVERNMENT'S RESPONSE TO DEFENDANT'S SENTENCING MEMORANDUM AND REQUEST FOR VARIANCE

The United States of America, by Robert J. Troester, United States Attorney for the Western District of Oklahoma, through Danielle M. Connolly, Assistant United States Attorney, submits this Sentencing Memorandum, including responses to objections raised in the Addendum to the Presentence Report ("PSR," *see* Doc. 50). According to the calculations as described in PSR, Defendant Phillip Niles Martin's advisory Guideline imprisonment range is 97 to 121 months. *Id.* at ¶ 76. The Government submits that the range is appropriately calculated and that a sentence within the Guidelines is warranted in order "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; and to provide the defendant with needed educational or vocational training […] in the most effective manner." 18 U.S.C. § 3553(a)(2).

I.   BACKGROUND.

Mr. Martin's illegal, firearm-related activity first came to law enforcement attention on January 26, 2013, when he was observed operating a table at Mary's Swap Meet, a flea market in eastern Oklahoma County, where he offered firearms and ammunition for sale. Doc. 50 at ¶ 48. At the time, he had approximately 10 firearms displayed with approximately 20 more in the back of his vehicle. *Id.* Returning to the swap meet two weeks later and observing Mr. Martin engaged in the same activity, an agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") told Defendant that he "could not purchase and sell firearms without the appropriate license." *Id.* Mr. Martin acknowledged that "he understood and agreed to stop selling firearms" (*id.*) but failed to do so.

In February 2020, ATF agents learned that a firearm that purchased by Mr. Martin was recovered at a crime scene in Mexico. *Id.* at ¶ 49. Mr. Martin advised agents that he could not recall to whom he had sold the gun. *Id.* He admitted however, to having sold firearms at Mary's Swap Meet and to having been advised by an agent in 2013 to stop selling firearms without a license. *Id.* Mr. Martin was again instructed to obtain proper licensing and was issued a formal cease and desist letter by an ATF agent. *Id.* He was also advised that he could be federally prosecuted if he were to continue selling firearms in this manner (*id.*), but he persisted.

In spite of these warnings, Mr. Martin continued to deal firearms without a license and his activities at Mary's Swap Meet *again* caught the attention of law enforcement in June 2022. *Id.* at ¶ 15. Witnesses advised that Mr. Martin and a partner operated a table

there where they offered firearms, some for nearly double their actual value, and some with apparently obliterated serial numbers – clearly something that Mr. Martin and his partner knew to be problematic as they removed those firearms from the display area when uniformed officers were nearby. *Id.*

An agent approached Mr. Martin's table on July 30, 2022, and completed the first of several undercover purchases there – in this instance, a Taurus pistol purchased for $550.00 that is typically priced between $300.00 and $330.00 in retail stores. *Id.* at ¶¶ 17-19. On November 5, 2022, Mr. Martin sold the same agent another firearm for $650.00. *Id.* at ¶ 20. The same day, an individual working with law enforcement who was in fact a felon, purchased a Smith & Wesson pistol from Mr. Martin without completing a background check. *Id.* at ¶ 21. When the man asked about completing paperwork, he was advised that none was needed. *Id.* Shortly thereafter, the felon returned to the table to look at more guns with another undercover agent, with whom he openly talked about his conviction. *Id.* While Mr. Martin and his associate declined to proceed with the sale at that time after receiving this information, they advised the agent to return; when the agent asked if he could purchase the firearm for the felon, Mr. Martin replied, "maybe." *Id.* The agent did in fact return to the table alone and purchase the pistol selected by the felon – which was later found to have been reported stolen in Sequoyah, Oklahoma, in October 2022 – less than a month prior to the sale at the swap meet. *Id.* On May 13, 2023, the same agent called Mr. Martin and arranged for the purchase of another pistol, which Mr. Martin produced quickly from the stock maintained at his residence and sold to him that afternoon at a nearby convenience store. *Id.* at ¶ 22.

Upon execution of a search warrant at Mr. Martin's northwest Oklahoma City residence on May 31, 2023, agents located approximately 195 firearms – including a machinegun conversion device within a pill bottle bearing his name inside of a safe to which Mr. Martin provided the code – as well as more than 6,000 pounds of ammunition, estimated by law enforcement to total in excess of 100,000 rounds. The firearms, many still packaged in plastic or the boxes in which they were originally purchased and many bearing swap meet price tags, were located throughout the house, including in Mr. Martin's bedroom, garage, and attic. In addition to a significant quantity of gold and silver, agents located approximately $469,520.00 in cash, as well as a commercial currency counter and ledgers.

## II. DEFENDANT'S OBJECTIONS TO THE PRESENTENCE REPORT AND REQUEST FOR PROBATION.

Mr. Martin lodged four objections to the PSR, which are memorialized in the Addendum.[1] Doc. 50 at 21-22. The Government responds herein.

### A. Mr. Martin's Admissions to Law Enforcement.

Mr. Martin's first objection to the PSR disputes his statement to law enforcement at the time of his arrest in that he "denies ever telling agents '…he admitted he sold firearms regardless of ownership.'" Doc. 50 at 21. His statements were documented by law enforcement and were conveyed in discovery materials, including at MAR_00023 as referenced by the PSR author. *Id.* While Mr. Martin does not seek a ruling on this

---

[1] As noted in the Addendum, the Government advised the PSR author that it had no objections to the PSR as drafted. *Id.* at 23.

4

objection and it would not impact the calculation of his Guidelines, the United States will have a witness available to provide corroboration at Defendant's sentencing hearing in the event that testimony would be helpful to the Court on this matter.

### B. Number of Firearms Involved is Correctly Calculated at 200 or More.

Mr. Martin's objection to paragraph 37 relates to the number of firearms involved in his offense conduct, and as a result the application of a Specific Offense Characteristic under USSG §2K2.1(b)(1)(E), impacting the calculation of his Guidelines, as reflected in his objections to paragraphs 47 and 76. *Id.* at 21-22; Doc. 54 at 4-6. The Government submits, however, that the correct number of firearms is reflected in the PSR and that Defendant's Guidelines are accurately calculated.

Pursuant to Application Note 5 to USSG §2K2.1, "[f]or purposes of calculating the number of firearms under subsection (b)(1), count only those firearms that were *unlawfully sought to be obtained*, *unlawfully possessed*, or *unlawfully distributed*, including any firearm that a defendant obtained or attempted to obtain by making a false statement to a licensed dealer." Mr. Martin's offense involved well over 200 firearms that were *unlawfully possessed* or *unlawfully distributed* in furtherance of the firearm trafficking conspiracy in which he engaged, as well as his dealing in firearms without a license, clearly meeting the threshold for application of USSG §2K2.1(b)(1)(E). The investigation demonstrates that Mr. Martin *sought to obtain* additional firearms in furtherance of the same.

During the execution of a search warrant at Mr. Martin's residence, agents recovered 195 firearms stored throughout his house, including a machinegun conversion

5

switch. Doc. 50 at ¶ 23. They also located numerous empty gun boxes. *Id.* Given that Mr. Martin sold a pistol to an undercover agent drawn from the stock he kept at home mere weeks prior to the execution of the search warrant, it is reasonable to discern that he had done the same previously and that the empty boxes were indicative of prior sales. *See id.* at ¶ 22. Agents also seized three firearms and two lower receivers belonging to Mr. Martin from his business partner the same day and the day following. *Id.* at ¶ 27. Undercover agents and an individual working with them purchased a total of five firearms from Mr. Martin and his associate: one on July 30, 2022; three on November 5, 2022; and one on May 13, 2023. *See id.* at ¶¶ 17-22.

In addition to these tangible items seized or purchased from Mr. Martin, his observed trafficking activity at Mary's Swap Meet on multiple occasions in 2013, 2022, and 2023 includes an untold number of additional firearms, as does his admitted activity in 2020 that resulted in a firearm that he purchased being recovered at crime scene in Mexico. *See* Doc. *id.* at ¶¶ 15, 17-20, 49, 50. Further, an investigation into his activities yielded numerous message threads on ArmsList.com, self-described as "the largest free gun classifieds on the web" where he endeavored to and negotiated the sale of firearms from at least December 2021 until shortly before his arrest. *Id.* at ¶ 30. While, certainly, not all of his attempted sales and purchases were successful, many apparently were. *Id.*

Mr. Martin points to the fact that the forfeiture allegation (*see* Doc. 34 at 2-17) includes only the firearms and conversion switch seized from his residence in support of his argument that the 200-firearm threshold was not met (Doc. 54 at 5), but the absence of the additional firearms from the forfeiture is not dispositive here. Specific to the five

6

purchased firearms, having sold them to agents and to the individual aiding them, Mr. Martin no longer had right, title, or interest to convey, and they were rightfully excluded from the forfeiture allegation. *See* Doc. 34. The additional firearms described *supra* – those involved in the undercover purchases and those part of the larger investigation – were intrinsic parts of Mr. Martin's offense, whether or not they were named in a charging instrument, and they are appropriately included regardless of their forfeiture status.

Mr. Martin argues that he "had been collecting firearms for decades" (Doc. 54 at 5), and while that may be true, he kept these firearms in stock in his residence, at the ready for paying customers. When on July 30, 2022, at the time of the first undercover buy, an agent asked if he had any other firearms similar to the Taurus pistol that he had purchased, Mr. Martin told him to return the next day. Doc. 50 at ¶ 19. He "offered to meet UC2 near northwest Oklahoma City to make the sale," while the address of the warehouse listed on his business card is on SW 113th Street in Oklahoma City – in an opposite quadrant of the city from the business, but near his residence in which nearly 200 firearms were recovered. *Id.* Similarly, months later during a subsequent undercover buy, when an agent contacted him regarding the purchase of a pistol on May 13, 2023, Mr. Martin "indicated he was at home and would look around his house to see what firearms he had. Martin then advised he had a Taurus 9mm pistol he would sell for $475.00." *Id.* They agreed to meet shortly thereafter at a convenience store immediately outside of Mr. Martin's subdivision. *Id.* Mr. Martin was able to quickly respond to the agent's request for a firearm and sell it to him – along with 50 rounds of ammunition – out of the stock at his residence. *Id.*

Execution of the search warrant demonstrated that Mr. Martin's firearms were located throughout his residence – in his bedroom, garage, attic – and a number of them were still wrapped in plastic or contained in their original boxes. Doc. 50 at ¶ 23. Many of them were the same make and model (*see* Doc. 34 at 2-17), indicating not that they were specialty pieces, but that they were kept as part of an inventory. Quite a few of them – throughout the residence, not confined to a specific location as would be indicative of a segment of one's collection partitioned for sale – bore blue painter's tape price tags with the cost to purchase written in black marker, consistent with the manner with which Mr. Martin and his associate displayed their wares at the swap meet. *See* Doc. 50 at ¶ 23. Further demonstrating that Mr. Martin operated his firearms trafficking business out of his residence was the recovery of a commercial currency counter and ledgers from among his inventory of guns and stacks of ammunition, as well as the massive quantity of currency and precious metals likely rendered in payment.

Ultimately, USSG §2K2.1(b)(1)(E) is correctly applied resulting in a 10-point increase to Mr. Martin's base offense level.

### C. A Probationary Sentence is Not Authorized Under the Guidelines.

Mr. Martin asks the Court to impose a sentence of probation. Doc. 54 at 2. Although both Counts 1 and 2 are Class C felonies for which he is eligible for not less than one nor more than five years of probation (*see* 18 U.S.C. § 3563(a)(2)), Mr. Martin is ineligible under the Guidelines. Doc. 50 at ¶¶ 81, 83. Application Note 2 to USSG §5B1.1 clarifies that, "[w]here the applicable guideline range is in Zone C or D of the Sentencing Table (i.e., the minimum term of imprisonment specified in the applicable guideline range

8

is ten months or more), the guidelines do not authorize a sentence of probation." Here, Defendant's guideline imprisonment range is 97 to 121 months – well above the threshold. *See* Doc. 50 at ¶ 76. A probationary sentence is not permitted under the Guidelines, nor would it be appropriate under the circumstances.[2]

### III.   STATUTORY FACTORS.

#### A. Nature and Circumstances of the Offense, Including its Seriousness.

The Court must, pursuant to 18 U.S.C. § 3553(a), consider the "seriousness of the offense" and the "nature and circumstances of the offense." Defendant characterizes his "role in this offense" as "overstated by the probation officer" (Doc. 54 at 4), but that is simply not the case. The sheer number of firearms recovered from his residence, as well as the recovery of a commercial currency counter and ledgers from among his stock of guns and ammunition, as well as the massive quantity of currency and precious metals likely rendered in payment demonstrate the significance of Mr. Martin's involvement in this firearms trafficking conspiracy. *His* name and contact information were emblazoned on a business card distributed to potential buyers. *He* kept inventory in the same building where he slept. *He* counted the proceeds from firearms trafficking – and kept them close at hand.[3]

---

[2]   Even if Mr. Martin's objections to Paragraphs 37, 47, and 76 were to be sustained – and the Government submits that they should *not* – probation would still not be authorized under the Guidelines. Mr. Martin's request would result in a total offense level of 22, and with a criminal history category of I, his advisory range would be 41 to 51 months. Doc. 50 at 21; Doc. 54 at n.1. This would still be above the authorized threshold for the imposition of a period of probation under the Guidelines.

[3]   Mr. Martin kept a large amount of currency in his residence, separate from the accounts that he maintains at several banks. *See* Doc. 50 at ¶ 71. He does not appear to be

Not merely "trading firearms" as he indicated to agents in 2020 (*id*. ¶ 49), Mr. Martin spent tens of thousands of dollars on firearms and a large quantity of ammunition at Academy Sports and Outdoors using a credit card offered by the store beginning in September 2020 – only months after his receipt of a cease and desist letter from an ATF agent. *Id*. at ¶ 29. Mr. Martin's firearm sales were not confined to the brokering of in-person deals, either. An investigation into his activities yielded numerous message threads on ArmsList.com where he endeavored to and negotiated the sale of firearms from at least December 2021 until shortly before his arrest. *Id*. at ¶ 30. While not all of his attempted sales and purchases were successful, many apparently were. *Id.*

Mr. Martin was present at Mary's Swap Meet, selling guns and ammunition week after week, apparently going back years. *Id*. at ¶¶ 48, 49; *see id.* at ¶¶ 15-22. During each visit to Mr. Martin's "store" at the swap meet, his table displayed a stock of multiple handguns and long guns typically exceeding a dozen, as well as high-capacity magazines – including those with 30-round capacity and 50-round drums – as well as copious amounts of ammunition. *See id.* at ¶ 17, 20. Agents noted the addition of firearms to the table during the course of their visits and surveillance, indicating that Mr. Martin and his partner were rotating product or filling in gaps after sales from additional inventory – during which "paperwork was not necessary." *See id.* at ¶ 18, 21. It is likely by similarly indiscriminate "trade" that Mr. Martin obtained the firearm stolen the month prior that he sold to the

---

distrustful of the banking system generally, and in fact, his spouse worked in management within that industry. Instead, it appears that he kept this money, likely proceeds of his firearms trafficking, separate – and certainly did not report it as income.

undercover agent seeking to straw purchase for a felon. *See id.* at ¶ 21. Four more of the firearms recovered from his residence were found to have been stolen as well. *Id.* at ¶ 23. There is no way to know how many more crime guns passed through Mr. Martin's business, nor for how many he facilitated transfer into prohibited hands. This type of behavior is gravely serious, and exactly the type addressed by Congress in the passage of the Bipartisan Safer Communities Act, as well as the United States Sentencing Commission in its recent amendments to the Sentencing Guidelines.

### B. History and Characteristics of the Defendant.

This Court must also consider the "history and characteristics of the defendant" when fashioning his sentence. 18 U.S.C. § 3553(a)(1). It appears undisputed that Mr. Martin has a strong familial support system with long-standing ties to the community and lengthy work history. Doc. 50 at ¶¶ 58-61, 65, 69-70; Doc. 54 at 3-4. There is no indication that Mr. Martin suffers from diminished capacity or did not understand the consequences of his actions. Doc. 50 at ¶ 65. He indicates that he is college educated, only six credits short of a degree (*id.* at ¶ 68; Doc. 54 at 3), and aside from some apparently age-related ailments (Doc. 50 at ¶¶ 63-64; Doc. at 3-4), appears to be healthy and stable.

In many of the cases presented for disposition before this Court, the defendants' actions are fueled by substance abuse and/or a lack of healthy social support. While no excuse, this often provides context and explanation for criminal behavior – but that is not the case here. Mr. Martin comes from what is by all accounts an exemplary background, but has chosen repeatedly, ignoring intermittent warnings, to continue to engage in the dangerous, potentially lethal behavior that brings him before the Court.

### C. Promotion of Respect for the Law, Deterrence of Criminal Conduct, and Protection of the Public.

The sentence imposed must reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense, as well as afford adequate deterrence to criminal conduct and protect the public from further crimes of the defendant. 18 U.S.C. § 3553(a)(2).

Mr. Martin has demonstrated that prior warnings of the risks posed by his actions and by his persistence in the illegal sale of firearms have been insufficient to deter additional criminal behavior. He was counseled in 2013 that dealing firearms without a license was illegal, but still he continued. Doc. 54 at ¶ 48. Warned again and issued a formal cease and desist letter by an ATF agent in 2020, he admitted to having been told to stop or seek proper licensing; but even after being advised that a firearm that he purchased had turned up at a crime scene in Mexico and that he could face federal prosecution if he persisted in dealing firearms without a license, he continued. *Id.* at ¶ 49. More recently, as observed in June 2022, Mr. Martin acknowledged wrongdoing by removing firearms with obliterated serial numbers from display when uniformed officers approached his table. *Id.* at ¶ 15. He expressed caution when advised that a potential customer admitted to being a felon – although he proceeded with a straw sale to that individual's benefit regardless. *Id.* at ¶ 21. Although Mr. Martin argues that his risk of recidivism is "extremely low," (Doc. 54 at 7), he has demonstrated time and time again that he is aware of the consequences of his actions and he will continue to repeat the same behavior, endangering the public by trafficking firearms and facilitating their delivery to prohibited individuals.

While given his age and relatively minimal criminal history[4] Mr. Martin's advisory Guidelines may seem high, they *are* appropriately calculated, and correctly include only one point – rather than the standard two under USSG §2K2.1(b)(5) because the offense involved a firearm that had been stolen – reflecting that under §2K2.1, "[t]he cumulative offense level determined from the application of subsections (b)(1) through (b)(4) may not exceed level **29**, except if subsection (b)(3)(A) applies."[5]  Further, while only one stolen firearm would have triggered the inclusion of this Specific Offense Characteristic, Mr. Martin's offenses involve *five*.  Doc. 50 at ¶¶ 21, 23.

A sentence within the calculated advisory guidelines would be just punishment and would send a clear message that the type of conduct in which Mr. Martin engaged, coupled with his clear disrespect for the law, will not be tolerated.  Such a sentence would not only protect the public from further crimes committed by Mr. Martin, it would promote specific and general deterrence in exactly the framework constructed by Congress and the Sentencing Commission.

---

[4]     While Mr. Martin's history only garnered one criminal history point, placing him in Category I, he was arrested for, cited for, or charged with driving under the influence on three separate occasions between 1984 and 2007.  Doc. 50 at ¶¶ 51, 54, 56.

[5]     Additionally, while Mr. Martin has agreed to forfeit a significant amount of property and currency, given the authority under 18 U.S.C. § 934 to pursue proceeds and facilitating property in exactly this type of firearms trafficking case, far more could have traced to his activity had Mr. Martin not so swiftly taken responsibility.

13

## CONCLUSION

The United States submits that Defendant's Guidelines are correctly calculated at 97 to 121 months' incarceration and a sentence within the advisory Guidelines, followed by three years of supervised release with the support of the United States Probation Office and oversight of this Court, would be sufficient but not greater than necessary to comply with the statutory purposes of sentencing.

Respectfully submitted,

ROBERT J. TROESTER
United States Attorney

s/ Danielle M. Connolly
DANIELLE M. CONNOLLY
Assistant United States Attorney
Oklahoma Bar Number: 33148
210 Park Avenue, Suite 400
Oklahoma City, Oklahoma 73102
Office: (405) 553-8700
Fax: (405) 553-8888
danielle.connolly@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on October 18, 2024, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrant:

Lance B. Phillips, counsel for Phillip Niles Martin.

s/ Danielle M. Connolly
DANIELLE M. CONNOLLY
Assistant United States Attorney
